Terrence PIATEK, Appellant,

v.

PULASKI TOWNSHIP,

v.

PULASKI TOWNSHIP POLICE DEPARTMENT.

Candace Ferguson, Appellant,

v.

Pulaski Township,

v.

Pulaski Township Police Department.

Eric Boron d/b/a Adultland, Appellant,

v.

Pulaski Township,

v.

Pulaski Township Police Department.

Commonwealth Court of Pennsylvania.

Argued Oct. 7, 2002.

Decided July 9, 2003.

---

Roger W. Wilcox, Jr., Buffalo, NY, for appellants.

Bernard P. Matthews, Greensburg, for appellee.

BEFORE: McGINLEY, Judge, COHN, Judge and FLAHERTY, Senior Judge.

OPINION BY Judge COHN.

The instant case is a local agency appeal in which the Lawrence County Court of Common Pleas affirmed the decision of the Pulaski Township Board of Supervisors (Board) denying applications for Adult Entertainment Facility (AEF) owner and employee licenses. For the reasons that follow, we affirm.

**Factual Background**

Appellants are the owner (Boron) and employees (Piatek and Ferguson) of an AEF named Adultland that was operating in Pulaski Township, Lawrence County.[1] On May 22, 2000, Pulaski Township enacted ordinance 2000–5–22 (ordinance) which, *inter alia*, required the licensing of employees and operators of sexually oriented businesses. The ordinance limited the hours of operation for such businesses to Monday through Saturday, 8:00 a.m. to 10:00 p.m. Existing adult businesses were given a 180–day grace period to apply for a license.

Because Boron's operation of Adultland, and Piatek's employment therewith, preceded enactment of the ordinance, the two fell within the 180–day grace period. However, neither applied for a license within the grace period. Following the elapse of the grace period, Township officials filed an injunction proceeding in the Court of Common Pleas of Lawrence County to preclude Adultland from continuing to operate.[2] In response, Boron filed preliminary objections in the nature of a demurrer, challenging the constitutionality of the ordinance.

On January 8, 2001, immediately before the scheduled hearing, the parties entered into discussions with the court, resulting in various stipulations and agreements that the court incorporated into an order entered by President Judge Pratt.

The parties stipulated that Boron was operating a sexually-oriented business without a license. Additionally, Boron agreed to limit the business' hours of operation. The court order provided that: Defendant Boron "shall voluntarily restrict the operations of the business in question by limiting the hours of operation from 8:00 a.m. to 2:00 a.m., Monday through Saturday, and closing the business from 2:00 a.m. Sunday to 8:00 a.m. Monday. These hours of operation shall remain in effect pending further disposition of this case."

---

1. Pulaski Township, together with the Pulaski Township Police Department, will be referred to jointly as Appellees in the remainder of this opinion.

2. The action was initiated on December 9, 2000, when Pulaski Township filed a civil complaint for injunctive relief, Docket Number 11357 of 2000, against Michael Ambrosia, Jr. and Eric V. Boron t/d/b/a "Adultland." The parties agreed to dismissal with prejudice of Michael Ambrosia from the case. He was listed in the Complaint as an owner but, in fact, was not.

The order also directed Boron and the employees to complete and file applications for adult business licenses by 4:00 p.m. of that day, and provided that failure to do so would result in automatic entry of a preliminary injunction prohibiting further operations of the AEF. The order did not address the constitutional arguments raised in the preliminary objections, but set a date to hear arguments on those issues.

In conformity with the order, Boron filed an application for an owner's license. In completing questions on the application, Boron indicated that Adultland would operate 24 hours a day, from Monday through Saturday, and would close on Sundays. Also in conformity with the order, Adultland employees Mary Thomas, Richard Daubenspeck, Terrence Piatek and Kristin Gaston filed applications for employee licenses.

Section 4 of the ordinance authorized the Chief of Police (Chief) to review applications to ensure compliance with the ordinance provisions. Upon receipt of an application, the Chief was directed to issue a temporary operator or employee license. The Chief was also directed to review each application and either issue or deny a permanent license within thirty days of receiving the application. The ordinance provided nine possible reasons for denying an application.

Pursuant to Section 4 of the ordinance, the Chief issued temporary licenses to Boron and the employees, pending final review of the applications. During the review process, on February 2, 2001, the Chief conducted an on-scene investigation of Adultland. While there, he determined that the employee working behind the main counter, Candace Ferguson, lacked either a temporary or permanent license. The next day, Ferguson applied for an employee license.

Shortly thereafter, the Chief denied Boron's business license citing three reasons for doing so: (1) the hours of operation listed on the application exceeded the allowable hours as set forth in the ordinance; (2) the store had been operating after 10:00 p.m. which was a violation of the ordinance's limits as to hours of operation;[3] and, (3) the business had been operating with employees who, contrary to the ordinance, did not have either a temporary or permanent employee license. The Chief also denied the employee licenses, because the business where they were working had not received a license.

Boron, Piatek, Ferguson, Thomas and Gaston[4] appealed the Chief's decision by filing a land use appeal with the Board. Appellants presented four arguments on appeal to the Board:[5] (1) the ordinance is unconstitutional both facially and as applied; (2) the business where the applicants were to be employed is not prohibited from operating; (3) Pulaski Township is equitably estopped from denying a permanent license based on the order of President Judge Pratt; and (4) Ferguson was merely a job candidate at the time of the investigation, and as such, did not need a license to work at Adultland.

3. The Board concluded that the stipulation provisions were in effect only up to the time the application was filed. As discussed *infra,* we believe the stipulation very clearly indicates that it will remain in force during the pendency of the application process.

4. Prior to the Board's decision, Thomas and Gaston withdrew their appeals because each had ceased their employment relationship with Adultland.

5. One argument, that Pulaski Township failed to approve or deny the application within thirty days, was withdrawn because, upon *reconsideration,* Appellants concluded that the Chief's review was performed within the appropriate time frame.

On March 2, 2001, the Board conducted a local agency hearing regarding the appeals. Boron acknowledged that *his application* indicated that Adultland would be open 24 hours a day, six days a week and closed Sunday, which was not permitted under the ordinance. However, he testified that he intended this answer only to indicate his intention to keep the store open to the extent allowed by law. He also acknowledged that Ferguson was working at the store on the date of the inspection, but claimed that it was her first day there, and that she was not an employee, but that she was just trying out the position to see if she was interested in continuing with it.

Contrary to this latter testimony, the Chief testified that, at the time he was inspecting the facility, he spoke with Ferguson, and she stated that she had been working there for approximately one week.

On July 25, 2001, the Board issued an adjudication denying the request for relief. It found the Chief more credible than Boron, and concluded that Boron's license for the establishment was appropriately denied because the listed hours of operation were a direct violation of Section 18 (hours of operation) of the ordinance.[6] Additionally, the Board noted that Boron employed persons who neither had a license to work at an AEF, nor had applied for one, in violation of Section 4.A.8 of the ordinance. The Board also discussed the denial of licenses for Ferguson and Piatek noting that, because the facility itself was not going to receive a license, and could not remain in operation, applicants who worked there would also not be able to receive a license. In regard to Ferguson's application, the Board noted that she began working there prior to obtaining a license and that, this alone, provided a sufficient basis to deny her license application. Furthermore, the Board determined that the ordinance did not violate any constitutional protection "afforded the appellants []either intrinsically []or as applied in this case." (Board Adjudication, Conclusion of Law No. 9.) The Board did not discuss the constitutional issues, instead indicating that the ordinance was constitutionally sound, relying on a case which is cited in the preamble of the ordinance. This case, from the United States District Court from the Western District of Pennsylvania, had found a similar ordinance to be constitutional. Boron, Piatek, and Ferguson appealed the Board's order and the matter was handled by Judge Motto.

Subsequent to the denial of the licenses, President Judge Pratt issued an order in the equity proceeding denying Boron's constitutional challenges. Nothing in the record indicates that this decision has been appealed.

Several months later, in February 2002, Judge Motto rendered a decision in the land use appeal case.[7] Judge Motto referred to President Judge Pratt's June 2001 opinion, noting that the same consti-

6. The Board also stated that the January 8, 2001 order of the Lawrence County Court of Common Pleas did not estop it from denying the permanent license. It noted that the hours established by this order were applied only pending the disposition of the commencement of the license application process for Adultland and its employees.

7. Judge Motto noted that Boron, et al., inappropriately titled their appeal "notice of land use appeal." The court also noted that cases involving the Municipalities Planning Code are brought before the zoning hearing board and that the zoning hearing board was *not* involved in this appeal. However, the court determined that Section 754(b) of the Local Agency Law, 2 Pa.C.S. § 754, applied, and that the standard of review imposed under this Section limited the court to determining whether there was substantial evidence to support the order of the local agency.

tutional issues had been raised and addressed in the injunction proceeding. The court concluded that "[w]here a new case is merely another proceeding addressing the same issues in the same overall matters, the new case cannot provide a basis upon which" the present judge "may overrule the decision of his colleague." (Trial Court Opinion at 4.) Accordingly, Judge Motto rejected the constitutional arguments on the basis of President Judge Pratt's decision. As to the remaining issues, Judge Motto applied the standard appropriate for a local agency appeal and found that the Board's decision was supported by substantial evidence. Boron, Ferguson and Piatek filed separate appeals, which have been consolidated before this Court.

Appellants here raise the following arguments: (1) that the common pleas court erred in failing to address the constitutional issues; (2) that the licensing ordinance is unconstitutional;[8] (3) that the court erred in denying Boron a sexually-oriented business license; and (4) that the court erred in denying Piatek and Ferguson AEF employee licenses.

Appellees contest each of these arguments, asserting, first, that the constitutional arguments should have been brought in a declaratory judgment action, and that they are inappropriately raised in a local agency appeal; second, that the ordinance is constitutionally sound; and

third, that the licenses were appropriately denied under the terms of the ordinance.

 In evaluating the decision of an agency, where a complete record is made before that agency, our standard of review is whether the agency committed an error of law and whether the material findings of fact are supported by substantial evidence. *SSEN, Inc. v. Borough Council of the Borough of Eddystone,* 810 A.2d 200, 205 (2002); *see also* Section 754 of the Local Agency Law, 2 Pa.C.S. § 754. In addressing constitutional violations, our standard of review is *de novo.* We will address Appellants' issues seriatim.

**Whether the Constitutional issues are appropriately before this Court for review**

The manner in which this case was brought to us is of some significance in determining the issues appropriately before this Court for review. The issue before the trial court was the denial of a license based on several specific factual reasons. In this appeal, Appellants argue that these reasons are not supported by substantial evidence. Additionally, Appellants have raised several constitutional issues, some of which relate to the application process and the reasons for the denial of the license, and others which do not. Those constitutional arguments that relate to the reasons for denial are appropriately before this Court for review. The remaining constitutional issues are not.[9] As to

---

**8.** Appellants raise seven constitutional arguments. First, the ordinance is an improper prior restraint that fails to maintain the status quo. Second, the ordinance is unconstitutionally vague. Third, the ordinance violates the constitutional right to privacy. Fourth, the ordinance unconstitutionally denies a sexually-oriented business license based on prior criminal conduct. Fifth, the ordinance's limitation on the hours of operation is unduly restrictive. Sixth, the Township's sexually-oriented business licensing requirements con-

stitute an unlawful prior restraint that does not guarantee prompt review. Seventh, the ordinance permits unconstitutional searches and seizures.

**9.** Appellants' licenses were denied, in part, because of failure to conform with the hours of operation listed in the ordinance. We address those constitutional arguments relating to the hours of operation. Information obtained during an inspection of the facility resulted in the denial on the basis of a non-

the constitutional arguments appropriately before the Board and Court for review, Appellants' first argument is that the trial court erred in applying the coordinate jurisdiction rule, and that, in doing so, inappropriately failed to decide the constitutional issues.[10] While we agree that the coordinate jurisdiction rule does not apply here, we find the principle of *stare decisis* does.[11] Further, it does not appear to us that the trial court failed to rule on the constitutional issues. Rather, the court addressed the issues by citing to the prevailing existing authority within that county that addressed the constitutionality of the ordinance. Judge Motto noted that identical arguments were addressed by President Judge Pratt in his decision in the equity proceeding and cited to Judge Pratt's opinion, concluding it was controlling as to the constitutional issues. The basis for the trial court's decision as to the constitutional issues is clear when one re-

fers to Judge Pratt's opinion. Thus, the issue is ripe for our review.[12] Accordingly, we apply our plenary review standard to the constitutional issues preserved before us.

## Constitutional Analysis

■ We begin our analysis by stating the basic legal principle that ordinances are presumed to be constitutional, and a heavy burden is placed on one seeking to challenge the constitutionality of an ordinance. *Commonwealth v. Ebaugh*, 783 A.2d 846, 849 (Pa.Cmwlth.2001).

### Prior Restraint Arguments

In addressing constitutional questions as to prior restraint, we are called upon, initially, to determine if the purported restraints were meant to limit expression, thereby subjecting them to strict scrutiny, or if the provisions are content-neutral,

licensed worker at the store. Accordingly, we address the constitutional search arguments. The vagueness argument impacts the enforceability of the ordinance, as a whole, to this particular facility; accordingly, we address the vagueness argument. However, the privacy issues and the denial of a license based upon prior criminal conduct have no bearing, in any manner, upon the denial of the licenses here. Neither impacts the overall enforceability of the ordinance (since the infirm provisions could be stricken from the ordinance).

10. The coordinate jurisdiction rule provides that judges of coordinate jurisdiction sitting in the same case should not overrule each other's decisions. *Commonwealth v. Starr*, 541 Pa. 564, 664 A.2d 1326 (1995). To determine if the rule applies, we must examine in what procedural posture the rulings occurred: "Where the motions differ in kind, as preliminary objections differ from motions for judgment on the pleadings, which differ from motions for summary judgment, a judge ruling on a later motion is not precluded from granting relief although another judge has denied an earlier motion." *Teamann v. Zafris*, 811 A.2d 52, 63–64 (Pa.Cmwlth.2002) (quoting

*Riccio v. American Republic Insurance Company*, 550 Pa. 254, 261, 705 A.2d 422, 425 (1997)). The instant case does not fall within the rule. Although the instant cases are related, they remain two distinct proceedings—an injunction proceeding sounding in equity and a local agency appeal.

11. "The rule of *stare decisis* declares that for the sake of certainty, a conclusion reached in one case should be applied to those which follow, if the facts are substantially the same, even though the parties may be different." *Pennsylvania Association of Milk Dealers v. Pennsylvania Milk Marketing Board*, 685 A.2d 643, 647 (Pa.Cmwlth.1996) (quoting *Commonwealth v. Tilghman*, 543 Pa. 578, 588, n. 9, 673 A.2d 898, 903 n. 9 (1996)).

12. Appellants argue that the trial court ignored the constitutional issues and that we should remand this case so that it can conduct a review of them. Alternatively, Appellants argue that we should review these constitutional issues *de novo*. Because we determine that the trial court ruled on these issues, we do not need to consider this contention further.

thereby subjecting them to less stringent inquiry.[13]

The United States Supreme Court has found ordinances that place operational limitations on AEFs to be content-neutral, when the primary purpose of these limitations, as set forth in the ordinance preamble, is the limitation of secondary impacts associated with sexually-oriented businesses. *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986).[14] Pennsylvania courts have repeatedly applied the analysis set forth in *Renton. See, e.g., Purple Orchid, Inc. v. Pennsylvania State Police*, 572 Pa. 171, 813 A.2d 801 (2002) (finding statute ban-

**13.** The United States Supreme Court set forth this less stringent standard in *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). In that case, the Court noted that a regulation would be justified, despite its incidental impact on First Amendment freedoms, if 1) the provisions are appropriately within the constitutional power of the government; 2) it furthers a substantial governmental interest; 3) the governmental interest is unrelated to the suppression of free expression; and 4) the incidental restriction on First Amendment freedoms is no greater than is essential to the furtherance of the interest.

**14.** In *Renton*, the High Court was faced with a local zoning ordinance that prohibited adult movie theaters from locating within 1,000 feet of a residential district. The district court ruled in favor of the City, the appeals court reversed and the Supreme Court reversed the appeals court. In doing so, the Court noted that:

At first glance, the Renton ordinance ... does not appear to fit neatly into either the "content-based" or the "content-neutral" category. To be sure, the ordinance treats theaters that specialize in adult films differently from other kinds of theaters. Nevertheless, as the District Court concluded, the Renton ordinance is aimed not at the *content* of the films shown at "adult motion picture theatres," but rather at the *secondary effects* of such theaters on the surrounding community. The District Court found that the City Council's "*predominate* concerns" were with the secondary effects of adult theaters, and not with the content of adult films themselves. App. to Juris. Statement 31a (emphasis added). But the Court of Appeals, relying on its decision in *Tovar v. Billmeyer*, 721 F.2d 1260, 1266 (C.A.9 1983), held that this was not enough to sustain the ordinance. According to the Court of Appeals, if *a motivating factor* in enacting the ordinance was to restrict re-

spondents' exercise of First Amendment rights the ordinance would be invalid, apparently no matter how small a part this motivating factor may have played in the City Council's decision. 748 F.2d, at 537 (emphasis in original). This view of the law was rejected in *United States v. O'Brien*, 391 U.S. at 382–386, 88 S.Ct. 1673....

*Id.* at 47, 106 S.Ct. 925. The Court further explained that:

In short, the Renton ordinance is completely consistent with our definition of "content-neutral" speech regulations as those that "are *justified* without reference to the content of the regulated speech...." The ordinance does not contravene the fundamental principle that underlies our concern about "content-based" speech regulations: that "government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views...."

It was with this understanding in mind that, in *American Mini Theatres*, a majority of this Court decided that, at least with respect to businesses that purvey sexually explicit materials, ... zoning ordinances designed to combat the undesirable secondary effects of such businesses are to be reviewed under the standards applicable to "content-neutral" time, place, and manner regulations. Justice Stevens, writing for the plurality, concluded that the city of Detroit was entitled to draw a distinction between adult theaters and other kinds of theaters "without violating the government's paramount obligation of neutrality in its regulation of protected communication," 427 U.S., at 70, 96 S.Ct. 2440, noting that "[it] is [the] secondary effect which these zoning ordinances attempt to avoid, not the dissemination of 'offensive' speech," *id.*, at 71, n. 34, 96 S.Ct. 2440.

*Id.* at 48–49 (footnote omitted and emphasis added).

ning nude dancing at establishments possessing a liquor license to be content-neutral and, therefore, subject to the *O'Brien* intermediate scrutiny analysis); *Golden Triangle News v. Corbett (Golden Triangle II)*, 700 A.2d 1056, 1062 (Pa.Cmwlth.1997), *affirmed sub nom. Golden Triangle News v. Fisher*, 553 Pa. 71, 717 A.2d 1023 (1998) (finding statute placing operational limitations on adult bookstore to be a content-

neutral attempt "at the amelioration of the adverse secondary effects of adult entertainment (as opposed to suppression of the speech itself), the regulation is deemed to be content-neutral.").

■ As in these other cases, the ordinance at issue in this case contains a section discussing the purposes of the Act, as well as the legislative findings upon which ordinance provisions are based.[15] From

15. Relevant portions of the ordinance read:
 **SECTION 1. PURPOSE AND FINDINGS**
 A. *PURPOSE:* Pursuant to the authority granted in the Second Class Township Code to promote and secure the health, cleanliness, comfort and safety of the citizens of Pulaski Township, to regulate and inspect the use and occupancy of public buildings, to regulate places of public entertainment, amusement and recreation, and to prevent and prohibit public nuisances due to adverse secondary effects, the Township of Pulaski ... enacts this Ordinance to minimize and control the adverse secondary effects of sexually oriented businesses and thereby protect the health, safety and welfare of its citizens; protect the citizens' property values and character of surrounding neighborhoods; and deter the spread of blight.
 The Board of Supervisors has determined that licensing is a legitimate and reasonable means of accountability to insure that operators of sexually oriented businesses comply with reasonable regulations and to insure that operators do not knowingly allow their establishments to be used as places of illegal sexual activity or solicitation.
 The Board of Supervisors does not intend this Ordinance to suppress any speech activities protected by the First Amendment, but to enact a content neutral ordinance which addresses the secondary effects of sexually oriented businesses.
 (Ordinance at p. 1.) The ordinance also includes several legislative findings of relevance to this proceeding:
 1. Law enforcement personnel have determined, and statistics and studies performed in a substantial number of communities in the Commonwealth, and in the United States, indicate that sexually oriented businesses have adverse secondary effects, including those specified and recognized at

68 Pa.C.S.A. § 5501(a), which secondary effects should be regulated to protect the public health, safety and welfare. These secondary effects include, but are not limited to, the spread of communicable diseases, performance of sexual acts in public places, presence of discarded sexually oriented materials on public and private property, sexual harassment, obscenity, prostitution and other illegal sexual activities, crime, decreased property values and neighborhood deterioration.
 2. Based on evidence concerning the adverse secondary effects of adult uses on the community presented in depositions and hearings conducted by the United States District Court for the Middle District of Pennsylvania, Case No. 3: CV99–1801 (Judge Munley), and by the United States District Court for the Western District of Pennsylvania, Case No. 98–1140 (Judge Lancaster); and in reports made available to the Township and on findings incorporated in the cases of *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), *Young v. American Mini Theatres*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), and *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991); and on studies in other communities including, but not limited to, Phoenix, Arizona; Minneapolis, Minnesota; Houston, Texas; Indianapolis, Indiana; Amarillo, Texas; Biloxi, Mississippi; Seattle, Washington; Oklahoma City, Oklahoma; Cleveland, Ohio; and Beaumont, Texas; and also on findings from the Report of the Attorney General's Working Group on The Regulation of Sexually Oriented Businesses, (June 6, 1989, State of Minnesota), the Township finds:
 (a) Sexually oriented businesses lend themselves to ancillary unlawful and unhealthy activities that are presently uncontrolled by the operators of the establish-

this prefatory language, it is clear that the legislative intent was to address secondary effects associated with the adult entertainment business, and that the operational restrictions were not content based. Accordingly, we hold that the ordinance is content-neutral, which, thereby, frames our review of Appellants' issues within the *O'Brien* intermediate scrutiny analysis.

Appellants maintain that the ordinance is unduly restrictive as to the hours of operation, citing for support *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). Appellees argue that under *Mitchell v. Commission on Adult Entertainment Establishments of the State of Delaware*, 10 F.3d 123 (3d Cir.1993), a case cited with approval by this Court in our *Golden Triangle II* decision, restrictions of similar hours of operation have passed constitutional muster.

■ We disagree with Appellants that *Playboy* is determinative of the hours of operation issue. In *Playboy*, the Court was addressing a regulation that specifically targeted the content of the speech itself.[16] As previously noted, we do not find the provisions of this ordinance to be content-based. In the instant case, the findings section of the ordinance clearly notes that the primary purpose for its enactment is to address the secondary effects arising from the operation of an AEF business. Several of the legislative findings raised concerns relating to hours of operation of the facility.[17] Based upon these findings,

---

ments. Further, there is presently no mechanism to make the owners of these establishments responsible for the activities that occur on their premises.

\* \* \* \*

3. Sexually oriented businesses have adverse secondary effects in the nature of a public nuisance, which secondary effects should be regulated to protect the public health, safety and welfare.

4. Sexually oriented businesses have operational characteristics which should be reasonably regulated in order to protect those substantial government concerns.

5. A reasonable licensing procedure is an appropriate mechanism to place the burden of that reasonable regulation on the owners and the operators of the sexually oriented business. Further such a licensing procedure will place a heretofore nonexistent incentive on the operators to see that the sexually oriented business is run in a manner consistent with the health, safety and welfare of its patrons and employees, as well as the citizens of the Township. It is appropriate to require reasonable assurances that the licensee is the actual operator of the sexually oriented business, fully in possession and control of the premises and activities occurring therein.

16. In *Playboy*, the High Court addressed the constitutionality of a provision of the Federal Telecommunications Act, 47 U.S.C. § 561.

Section 561 required cable television operators that provided sexually-oriented channels either to limit the transmission of such channels to times when children would not be watching television, or to scramble the sexually-oriented channel. Because scrambling was not one hundred percent effective, the provision resulted in cable operators only being able to broadcast such material after 10:00 p.m. The cable operators brought suit, alleging that the severe limitation of hours that they could broadcast was an undue restriction that infringed their First Amendment rights. The Supreme Court agreed, stating that:

> To prohibit this much speech is a significant restriction of communication between speakers and willing adult listeners, communication which enjoys First Amendment protection. It is of no moment that the statute does not impose a complete prohibition. The distinction between laws burdening and laws banning speech is but a matter of degree.

*Playboy*, 529 U.S. at 812, 120 S.Ct. 1878. In the instant case, Appellants ask this Court to apply *Playboy* and strike down, as unconstitutional, the restriction of hours of operation delineated in the ordinance.

17. The legislative findings section of the ordinance addresses the basis for the limitations. The findings cite to studies from other com-

we hold that the limitation of hours is no greater than is necessary to accomplish these legitimate governmental goals. *O'Brien.*

In reaching this conclusion, we are guided by the *Mitchell* case cited by Appellees. In *Mitchell,* the Third Circuit addressed a similar ordinance, which limited the hours of operation of an adult business to 10:00 a.m. through 10:00 p.m., Monday through Saturday, and required such businesses to remain closed on Sundays and legal holidays. The Third Circuit found such regulations on hours to be content-neutral and narrowly tailored.[18] It concluded, based on (1) pre-enactment evidence, (2) reliance on studies from other locales and (3) post-enactment evidence, that hours of limita-

tion from 10:00 a.m. to 10:00 p.m., Monday through Saturday, were enacted to limit the harmful secondary aspects of business, and not to stifle speech; therefore, the limitation was not too restrictive. For the same reasons, we hold that the hours of operation in the instant ordinance are constitutionally sound.[19]

*Prior Restraint as to the Status Quo*

■ Appellants' primary argument is that the ordinance imposes a prior restraint on them by failing to maintain the status quo during the pendency of the application process. Appellants maintain that, although the ordinance provides for the issuance of temporary licenses during the application process, these licenses are,

---

18. munities, as well as to precedent, that recognized some of the potentially harmful impacts of such businesses. As to the hours of operation, the statute notes that limiting the hours:
> reduces the adverse secondary effects of such businesses, including, particularly, but not limited to, late night noise levels, crime and sexually offensive materials and activities in public areas, and promotes the public health, safety and welfare.

(Ordinance Section B.2.–13.) The next finding of the ordinance notes that:
> The reasonable regulation and supervision of sexually oriented businesses tends [sic] to discourage sexual acts and prostitution and thereby promote the health, safety and welfare of patrons, clients and customers of these businesses.

(Ordinance Section B.2.–14.)

18. The Court reasoned that:
> There is no evidence that the legislature adopted the closing-hours amendment because of disagreement with the message the speech conveys.... The closing-hours amendment only limits adult entertainment establishments' hours of operation to twelve hours per day excluding Sundays and legal holidays. It does not affect the content of speech directly, but only incidentally for the avowed purpose of decreasing traffic congestion, parking problems, the performance of sexual acts in public, and the littering of discarded sexually explicit materials near residential communities.... Furthermore,

it appears that the content of the sexually explicit speech and expressive activity that businesses like Adult Books purvey permits legislative bodies to put adult entertainment establishments in a different category than other entertainment establishments.... In determining whether a legislative enactment meets the threshold test of content neutrality, courts typically look only to the predominate concern of the enacting body. Whether the asserted government interest is proper and adequately supported is usually analyzed in terms of whether the enactment is narrowly tailored to achieve this interest, the second prong of the *Renton* test.... Therefore, we conclude that the closing-hours amendment is content-neutral in nature, and turn now to analysis of whether it is narrowly tailored. This, the second prong of *Renton's* tripartite test, itself has two parts.

*Mitchell* 10 F.3d at 132–133 (citations omitted).

19. We note that other courts dealing with similar statutory provisions have found likewise. *Star Satellite, Inc. v. City of Biloxi,* 779 F.2d 1074 (5th Cir.1986); *Ino Ino, Inc. v. City of Bellevue,* 132 Wash.2d 103, 937 P.2d 154 (1997), *opinion amended,* 943 P.2d 1358 (Wash.1997), *cert. denied,* 522 U.S. 1077, 118 S.Ct. 856, 139 L.Ed.2d 755 (1998); *City of Colorado Springs v. 2354 Inc.,* 896 P.2d 272 (Colo.1995).

themselves, subject to the regulations before there has been any determination as to the validity of the constitutionality of the ordinance. They argue that "under the township's licensing ordinance scheme, the status quo has been irrevocably altered before there could be a judicial determination as to whether or not the ordinance itself is constitutional and enforceable." As instances of the status quo having been altered, Appellants note that the hours of operation are limited during the review period, and applicants have been required to disclose information to the governmental agency before there has been a determination that the municipality may request this information. In support of this position, Appellants cite to two cases, *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965)[20] and *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (plurality opinion).[21]

In response, Appellees contend that the ordinance complies with the requirements of *Freedman* and *FW/PBS*. Appellees note that Section 9.B. of the ordinance authorizes an applicant who is denied a license to continue to operate during the appeal process to the same extent it could operate prior to the license denial.

■ Under these circumstances, we can not find Appellants' arguments persuasive. The status quo was maintained for Adultland for at least 180 days after enactment of the ordinance. As an AEF in operation at the time of the ordinance's enactment, Adultland had ample opportunity to pursue appropriate declaratory relief to determine the constitutionality of the ordinance. It did not do so. Rather, in response to the Township's equity action, Adultland pursued preliminary injunctive relief on the basis that the ordinance was unconstitutional, and the common pleas court was prepared to conduct a hearing on the pending injunctive claims. However, Adultland voluntarily agreed to stipulations providing that, *inter alia*, it would limit its hours of operation and would submit the appropriate license application. The court, subsequently, adopted the stipulations into a court order. Adultland could have withheld consent to these stipulations and allowed the preliminary injunction hearing to proceed, thereby preserving its argument that the ordinance altered the status quo; however, it declined to do so. Its argument that the status quo was altered is essentially a collateral attack on the initial order entered in the injunction proceeding that ordered the submission of applications. Adultland is bound by the terms and legal consequences of the stipulation it voluntarily entered into, and from which it did not appeal.

■ As to the limitation on the hours of operation, as previously discussed, the time limits set forth in the ordinance are constitutionally valid. As such, there is no

---

**20.** Appellants cite *Freedman* for the proposition that a licensing scheme is unconstitutional as a prior restraint unless three procedural safeguards are met: first, the decision as to issuing or denying the license must be made within a brief, specific period of time; second, there must be an expeditious judicial review of a decision denying the license; third, if a license is denied, the licensing authority bears the burden of going to court and the burden of proof to suppress the speech.

**21.** In *FW/PBS*, the United States Supreme Court struck down as unconstitutional a Dallas ordinance requiring adult businesses to obtain a permit from the chief of police in order to operate because it placed unbridled discretion in the hands of a government official or agency, and failed to guarantee prompt judicial review of a denial of the license.

constitutional infirmity in requiring applicants operating under a temporary license to limit business hours to those provided for in the ordinance.[22]

Regarding the *Freedman* and *FW/PBS* issues regarding prompt review and limits on discretion, we recently analyzed similar arguments. *See Jay–Lee, Inc. v. Municipality of Kingston Zoning Hearing Board,* 799 A.2d 923 (Pa.Cmwlth.2002), *petition for allowance of appeal denied,* 572 Pa. 714, 813 A.2d 846 (2002).

In *Jay–Lee, Inc.,* we discussed both Federal and Pennsylvania constitutional arguments:

> While prior restraints are not unconstitutional *per se,* any system of prior restraint bears a heavy presumption against its constitutional validity. *FW/PBS,* 493 U.S. at 224, 110 S.Ct. 596, 107 L.Ed.2d 603. The United States Supreme Court, in addressing prior restraints, has identified two scenarios that will not be tolerated. First, a licensing scheme that places unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship. *Id.* at 224–25, 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603. For example, an ordinance that makes the peaceful enjoyment of constitutionally-guaranteed freedoms contingent upon the uncontrolled will of an official by requiring a permit or license which may be granted or withheld in the discretion of such official, is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms. *Id.* at 226, 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603. Second, a prior restraint that fails to place limits on the time within which the decisionmaker must issue the license is not permissible. *Id.*

*Jay–Lee, Inc.,* 572 Pa. ——, 799 A.2d at 929.

■ Here, Section 4.A. authorized the issuance of a temporary license, which Appellants received, that allowed them to continue to operate or work in the business for the thirty days during which the Chief's decision had to be made. Just as in *FW/PBS,* the Chief, here, simply performed a ministerial act in reviewing the general qualifications of the license applicant, and ensuring that the requirements were met. The ordinance does not delegate discretionary authority to the Chief, nor do Appellants raise any abuse of discretion argument.

Additionally, the ordinance afforded existing businesses such as Adultland, a six-month grace period to obtain a license. As for the expediency of judicial review, Section 9.A. provides for an initial appellate review before the Board, which is required to conduct a hearing within twenty days of the date of the appeal. The same provision allows for the business to continue operation during the pendency of any subsequent appeals. The ordinance also requires the Township to consent to an expedited appeal if one is sought by the aggrieved applicant. Additionally, the ordinance is not content-sensitive, but simply places on the reviewing authority, the

---

**22.** We agree with Appellants that the municipality is required to maintain the status quo during the licensing process. Although Appellants argue that their limitation of hours during the review of the constitutional issues of this case constituted a prior restraint, we note, again, that Boron volunteered to limit Adultland's hours of operation during the injunction proceeding. The common pleas court, subsequently, incorporated these hours of operation into a court order that was to remain in effect during the application proceedings. As it was the limitation of hours pursuant to court order that were in effect, and as these hours were self-imposed, we find no non-consensual disruption of the status quo during the review of the constitutionality of these provisions.

Chief of Police, the ministerial task of ensuring that the general requirements of each license have been met.

There is no question that the applications were reviewed within the given time period. Accordingly, we reject Appellants' prior restraint arguments and conclude that the standards enunciated in *Jay–Lee, Inc.* have been met.

*Unconstitutionally Vague*

■ Appellants also contend that the licensing ordinance is vague, rendering it unconstitutional. Specifically, Appellants maintain that the phrase "principle purpose" in the definition of "adult bookstore, adult novelty store or adult video store" is vague and constitutionally infirm "because it fails to advise business owners and operators as to an objective measurement (such as percentage) of inventory, sales or floor space" that would lead to the business falling within this classification.[23] (Appellants' Brief at 22.) Appellees contest Appellants' argument, arguing that in *Golden Triangle News v. Corbett (Golden Triangle I)*, 689 A.2d 974, 984–85 (Pa.Cmwlth. 1997),[24] we found similar language to be constitutionally sound.

■ An ordinance is unconstitutionally vague only when it fails to give a person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited by the law. *Ebaugh*, 783 A.2d at 849. We agree with Appellees that we addressed similar language regarding an AEF in *Golden Triangle I*.[25] For the same reasons set forth in that opinion, we find, here, that

---

**23.** Appellants cite to the following portion of Section 2.B.:

> ***ADULT BOOKSTORE, ADULT NOVELTY STORE OR ADULT VIDEO STORE*** means a commercial establishment which, as one of its *principal purposes*, offers for sale or rental for any form of consideration any one or more of the following:
>
> 1. books, magazines, periodicals or other printed matter, or photographs, films, motion pictures, video cassettes or video reproductions, slides or other visual representations which are characterized by the depiction or description of "specified sexual activities" or "specified anatomical areas;" or
> 2. instruments, devices or paraphernalia which are designed for use in connection with "specified sexual activities."
>
> (Ordinance Section 2.B.) (emphasis added).

**24.** *Golden Triangle I* was a single judge opinion of this Court addressing a number of constitutional issues raised in a preliminary injunction proceeding. In the subsequent *Golden Triangle II* opinion we, *inter alia*, reaffirmed the analysis set forth in *Golden Triangle I*.

**25.** Among the issues we addressed in *Golden Triangle* was whether the term "adult bookstore" as defined in what is commonly known as Act 120 of 1996, 68 Pa.C.S. §§ 5501–5509,

was unconstitutionally vague. The Act defined adult bookstore as:

> An establishment having a substantial or significant portion of its stock and trade in, or an establishment which, as one of its principal business purposes, offers for sale, books, films, video cassettes or magazines and other periodicals which are distinguished or characterized by their emphasis on matter depicting, describing or relating to specified sexual activities or specified anatomical areas, and in conjunction therewith has facilities for the presentation or adult entertainment for observation by patrons.

68 Pa.C.S. § 5502. The owner in the case contended that this definition was vague, specifically because "substantial" was undefined. In rejecting the owner's argument, we noted that:

> [T]he terms "substantial" and "significant" have recognized meanings in the English language … and the use of such in the definition of "adult bookstore" does not render it vague merely because a percentage of business in one type of item is not specified. Limiting the definition of "adult bookstore" to establishments that meet a specific sales percentage would frustrate the Act's purpose by drawing arbitrary classifications.

*Golden Triangle I*, 689 A.2d at 984–85 (footnote omitted).

the phrase "principal purpose" is readily discernable by a reasonable person using common sense.[26] Thus, we discern no constitutional infirmity based upon vagueness.

*Unconstitutional Search and Seizures*

■ Appellants argue that the ordinance provides for unconstitutional search and seizure and, specifically, that Section 6.A. authorizes police to conduct warrantless searches of the premises to evaluate compliance with the provisions. Appellees disagree, citing to our *Golden Triangle* decisions and *Frey v. Panza,* 621 F.2d 596 (3d Cir.1980), *cert. denied,* 449 U.S. 1035, 101 S.Ct. 611, 66 L.Ed.2d 497 (1980).

The ordinance provision in question reads:

*SECTION 6. INSPECTION*

A. Subject to the consent of an applicant or licensee, the Township Police Chief may inspect the premises of sexually oriented businesses for purposes of ensuring compliance with this Ordinance, during any time it is open for business. In the event that the Township Police Chief has probable cause to believe that a sexually oriented business is operating in violation of this Ordinance, he may inspect the premises of the sexually oriented business for purposes of ensuring compliance with this Ordinance during any time it is open for business.

(Ordinance Section 6.A.) We agree with Appellees.

In *Golden Triangle I,* we were faced with a statutory search provision that provided that adult-oriented establishments "shall be open to inspection at all reasonable times by inspectors." *Golden Triangle I,* 689 A.2d at 985. The business owner

argued that this statutory provision, allowing for warrantless searches, violated Article I, Section 8 of the Pennsylvania Constitution. We ruled that the provision was constitutional, *inter alia,* because "[i]n general, warrantless, administrative inspections in a regulated area of business are constitutional." *Id.* at 985 n. 14 (referencing *Commonwealth v. Blosenski Disposal Service,* 523 Pa. 274, 566 A.2d 845 (1989)). In concluding that these inspections were proper, we noted that they would be of limited scope, taking place during business hours, involving only those areas of the facility open to the general public, and limited to ensuring compliance with specific statutory provisions. We noted that:

An inspection which did not occur during business hours or which ventured into areas not open to the public, such as private management offices, would be a completely meaningless venture in that it would not reveal whether the operator was maintaining a well lighted establishment, prohibiting minors from loitering on the premises and maintaining visibility into the private viewing areas.

*Golden Triangle I,* 689 A.2d at 985. Our opinion in *Golden Triangle* was consistent with the United State Supreme Court decision in *Maryland v. Macon,* 472 U.S. 463, 469, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985), in which the Court concluded that a police investigator's entry into the public areas of an adult bookstore, did not constitute a search. In reaching this conclusion the High Court reasoned:

A search occurs when "an expectation of privacy that society is prepared to consider reasonable is infringed." Here, respondent did not have any reasonable expectation of privacy in areas of the store where the public was invited to

---

26. Webster's Tenth Collegiate Dictionary 924 (10th ed.2001) defines "principal" as "most

important, consequential, or influential: CHIEF."

enter and to transact business. The mere expectation that the possibly illegal nature of a product will not come to the attention of the authorities, whether because a customer will not complain or because undercover officers will not transact business with the store, is not one that society is prepared to recognize as reasonable. The officer's action in entering the bookstore and examining the wares that were intentionally exposed to all who frequent the place of business did not infringe a legitimate expectation of privacy and hence did not constitute a search within the meaning of the Fourth Amendment.

*Macon*, 472 U.S. at 469, 105 S.Ct. 2778 (citations omitted).

In the instant case, the inspection took place during the hours of operation of the business and was limited to those areas of the store open to the public. In accordance with our reasoning in *Golden Triangle*, and in light of the analysis in *Macon*, we see no constitutional infirmity in this inspection or in Section 6 of the ordinance.

**Constitutional Arguments Conclusion**

Having addressed each of the facial constitutional issues preserved and raised before this Court,[27] and having found no constitutional infirmity pertaining to these arguments, we turn to the arguments arising from the application of this ordinance.[28]

**Whether the Board Erred in Denying Boron's License**

 Appellants' allege that the Board erred in denying the license based upon Boron's employment of persons who had not applied for a license. With regard to this issue, Section 3.A.2 of the ordinance prohibits an AEF business from employing any person who does not have an AEF employee license. Section 4.A. of the ordinance authorizes the Township Police Chief to investigate the information contained in the application. The Chief, in this capacity, went to Adultland to inspect the facility, and determined that one of the employees did not have a license. Section 4.A.8 permits a business license to be rejected if the application demonstrates that the business is not in compliance with the ordinance. The Board rejected Boron's testimony that this "employee" was actually a non-employee working at Adultland on a trial basis, and that this had been her first day. The Board makes credibility determinations and it was within its authority to conclude that Boron was intentionally employing individuals whom he

---

**27.** Appellants also cite to sections 1, 7 and 8 of Article I, of the Pennsylvania Constitution. We note that in *Golden Triangle I* and *II*, we rejected similar arguments involving these sections and see no basis from the facts and arguments raised in the instant case, to depart from our reasoning in the *Golden Triangle* cases. Accordingly, Appellants state constitutional claims are denied.

**28.** Appellants raise *additional constitutional* issues that, as previously noted, are not appropriately before us. They assert that compulsory disclosure of the following information, requested in the application, violated the applicants' privacy rights: any convictions for previous crimes of applicant and any person residing with applicant; prior adult businesses where applicant may have worked; ap-

plicant's mailing address and residential address; recent photograph of the applicant; applicant's driver's license and social security numbers. We note that President Judge Pratt's analysis does not discuss the provisions requiring the disclosure of information regarding the criminal background of other persons with whom an applicant resides. From the policy bases listed in the initial sections of the ordinance, and in light of the standard set forth in *Denoncourt v. State Ethics Commission*, 504 Pa. 191, 470 A.2d 945 (1983)(finding that statute requiring political officials to disclose, *inter alia*, financial information of their spouses and children, was constitutionally infirm), we have serious doubts that this provision would pass constitutional muster.

 

knew did not have the appropriate license.[29] We find no error with the Board's conclusion that such employment was evidence of Boron's intent to violate the ordinance, and hold that, on this basis alone, the Board could appropriately deny the license.[30]

**Whether the Board Erred in Denying the Employees' Licenses**

Appellants argue that since Boron should have been granted a business license, and since the basis for denying the employee licenses was that the business was denied a license, the Board should have approved the employee licenses for Piatek and Ferguson. However, because we have concluded that the Board did not err in denying Boron's license application, we likewise conclude that the Board appropriately denied the employee licenses.

**Conclusion**

For the foregoing reasons, the order of the Court of Common Pleas of Lawrence County is affirmed.

### ORDER

NOW, July 9, 2003, the order of the Court of Common Pleas of Lawrence

County in the above-captioned matter is hereby affirmed.

---

29. We note also that Boron was well aware of the requirement that employees apply for licenses, since the court order issued in the injunction case required all prospective employees to apply for licenses.

30. Appellants also contend that the Board erred in denying the license based upon the hours of operation listed on the application. Boron had testified, and now argues, that the 24–hour answer on the application merely indicated his intent to operate the facility to the fullest extent allowable by law, since he was challenging the constitutionality of the statute. He also posits that, while awaiting the decision, he could operate 24 hours a day. We, first, note that certain limitations as to

the hours of operation were placed on Adult-land by means of the order in the injunction case. We also note that the Board weighed the credibility of Boron and discounted his testimony as to the intent behind his answers on the application. Whether the listing of improper hours, on its own, would have supported the Board's denial of the license, is not clear. However, when viewing it in terms of the overall factual circumstances, particularly Boron's intentional employment of non-licensed individuals, we find no error in the Board's determination that there was evidence of Boron's intent not to abide by the ordinance terms.